**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ANTHONY SCOTT COLEMAN,

          Plaintiff,

v.                                    CIVIL ACTION NO.  2:24-cv-00654

CHRIS KENDALL, et al.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Defendants City of Dunbar and Officers Kendall, Oxley, and Shafer move for Summary Judgment. [ECF Nos. 77, 79]. Because genuine disputes of material fact exist, the motions are **DENIED**.

### I.     BACKGROUND

This case arises from a traffic stop. Plaintiff was pulled over by Defendant Officer Oxley after Defendant observed Plaintiff driving and drinking from a liquor bottle. Plaintiff stopped, provided Defendant Oxley with his driving information, and was generally compliant. But eventually Defendant Oxley asked Plaintiff to get out of the vehicle. Plaintiff refused, and Defendant Oxley called for back up officers who arrived with a K-9. Chaos followed.

According to the Officer Defendants, Defendant Kendall arrives, approaches Plaintiff who is still sitting in the driver's seat of his car, and attempts to unlock Plaintiff's door from the inside. [ECF No. 80, at 4]. Plaintiff then "grabs Officer Kendall's hand" to "prevent[] Officer Kendall

from opening Plaintiff's vehicle's door." *Id.* A struggle ensues as Officer Kendall attempts to open the door while simultaneously restraining Plaintiff with his arm. The door eventually opens, but Plaintiff remains in the seat with the seat belt fastened across him. Officer Kendall cuts the seat belt.

Officer Shaffer appears with the police canine ("K-9" or "Molly"), and Officers eventually use Molly to pull Plaintiff from the car after their attempts were unsuccessful. Molly engages by biting Plaintiff's leg and dragging him out of the car onto the ground. Defendants assert that Plaintiff continues to resist, so the K-9 remains engaged on his leg and Officer Kendall strikes Plaintiff's face to achieve compliance. Eventually, Plaintiff becomes fully compliant. The thrust of Defendants' version of events is Plaintiff's alleged noncompliance, described as continuous and aggressive. This, Defendants argue, justifies the increasing uses of force by Officers.

Plaintiff's version of events differs in two important ways: (1) the nature of the force used by Officers and (2) the extent of Plaintiff's noncompliance. First, Plaintiff asserts that Officer Kendall's attempt to open the car door was startingly, and Plaintiff reached out only reflexively to make a minor contact. [ECF No. 88, at 3]. This, Plaintiff alleges, resulted in both a physical and verbal escalation from Officer Kendall, who struck Plaintiff. Plaintiff alleges that throughout this period of the encounter, he remained calm, but still the Officers moved away so that the K-9 could be deployed on "a nonviolent, nonthreatening, and terrified" Plaintiff. [ECF No. 88, at 5]. While the K-9 engaged with Plaintiff's leg, Officers held him down while Defendant Officer Kendall repeatedly "punch[ed] Mr. Coleman ten times in the head." [ECF No. 88, at 6].

Second, Plaintiff emphasizes his continued compliance—or at the very least passive resistance—throughout the encounter. He asserts that clear and calm verbal communication from the Officers would have minimized the need for physical force, but that ultimately the forced used

against him was gratuitous and unnecessary under the Fourth Amendment. Once the encounter ended, Plaintiff suffered "lacerations and blunt force trauma to his head, severe dog bite wounds to his leg," and "the psychological impact of an unexpected and unwarranted assault by law enforcement." [ECF No. 88, at 6].

The record also includes body cam videos and cell phone video. The videos clearly show an encounter that rapidly became aggressive and combative both physically and verbally. The videos corroborate Plaintiff's initial non-compliance, failing to step out of his vehicle, and the videos generally confirm the order of events as described by the parties. No video, however, entirely corroborates or refutes the nature of the force used by Officers or the extent of Plaintiff's resistance. Because a reasonable jury may consider these versions of events as well as the videos and come to different conclusions of fact, the motions for summary judgment must be denied.

## II.    LEGAL STANDARD

A court "may grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.,* 597 F.3d 570, 576 (4th Cir. 2010).

Summary judgment is appropriate when the nonmoving party does not sufficiently establish an essential element of his case on which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden by offering more than a mere "scintilla of evidence" in support of his position. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). "[A] party opposing a properly supported motion for summary judgment

may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Id.* Thus, the non-moving party may not rely on conclusory allegations or unsupported speculation. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

Additionally, video evidence that clearly contradicts unsupported allegations can be considered undisputed evidence sufficient to warrant summary judgment where "[the opposing party's] version of events is so utterly discredited by the record that no reasonable jury could have believed him." See *Scott v. Harris*, 530 U.S. 372, 380–81 (2007).

## III.   DISCUSSION

### A.   Qualified Immunity for Officer Defendants

The Officer Defendants assert they are entitled to qualified immunity. [ECF No. 80]. As to the two prongs of the analysis, they first argue that no constitutional violation occurred. *Id.* at 8. And on the *Graham* factors (discussed later), the Officer Defendants argue that the severity of the crime, the immediate threat to officers, and the Plaintiff's resistance all support the objectiveness of Defendants' actions. *Id.* at 10–14. Second, the Officer Defendants assert that they did not violate a clearly established right. *Id.* at 14.

I disagree. Recently the Fourth Circuit addressed § 1983 actions and qualified immunity:

Section 1983 of Title 42 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013); *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023). Of relevance here, law enforcement officers sued in their individual capacities under § 1983 may invoke a claim of qualified immunity, which shields "government officials from

4

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (citation modified). As [the Fourth Circuit has] recognized in that respect, the judicially-created doctrine of qualified immunity is designed to "protect[ ] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *See Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (citation modified).

. . . [The] qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation. *See Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). If the answer on either question is "no," the officer being sued is entitled to qualified immunity. *See Pearson*, 555 U.S. at 232, 129 S.Ct. 808. Courts are entitled to exercise their discretion as to which prong is addressed first. *Id.* at 236, 129 S.Ct. 808.

*Harrold v. Hagen*, 174 F.4th 393, 401–02 (4th Cir. 2026) (King, J.).

Turning to the first prong, the court must use the *Graham* factors to assess an excessive force claim: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must also pay "careful attention to the facts and circumstances of each particular case," *id.*, because "reasonableness under the Fourth Amendment is not capable of precise definition of mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Defendants suggest that each *Graham* factor weighs in their favor and that the facts of this case are straightforward. This is wrong. First, while driving under the influence, a misdemeanor in West Virginia, is certainly a serious violation of the law and a danger to the driver and the public, nothing in the record suggests that Plaintiff's commission of drunk driving injured any other person or himself. Nor does the record show that Plaintiff was observed swerving, mounting the curb, or

5

driving recklessly. He was pulled over because an officer witnessed Plaintiff drinking from a suspected bottle of alcohol. A reasonable jury, considering this factor, could find that it weighs in favor of the Plaintiff.

So too could a reasonable jury disagree as to whether Plaintiff posed a threat to Defendant Officers and whether Plaintiff's resistance was active or passive.[1] As already discussed in the Background, the parties vigorously disagree about the Plaintiff's resistance, in part, based on the threat perceived by Defendant Officers. The Officers emphasize Plaintiff's refusal to exit his vehicle and the sudden movement Plaintiff made with his open hand when an officer reached into his vehicle. Plaintiff asserts that the brief hand contact with the officer was reflexive, and that whatever resistance he displayed was passive until he eventually complied as he was physically removed from the car. The videos in the record similarly fail to clarify these facts. At most, the videos show an encounter which Officers quickly escalated both verbally and physically.[2]

The briefing on these motions, and the parties' characterization of events clearly demonstrate genuine disputes of material fact which a jury should resolve. To fully answer the first prong of qualified immunity, a jury must weigh the testimony, videos, and other evidence to make credibility determinations about whether Officers used excessive force against Plaintiff in violation of the Constitution.

Turning to the second prong of qualified immunity—whether the right violated was clearly established by the July 19, 2023 incident with Plaintiff—the Fourth Circuit has recently answered this question simply: "the Fourth Amendment right of a non-threatening, unarmed, and passively-resisting suspect to be free from unnecessary, gratuitous, and disproportionate force by deployment

---

[1] Nothing in the record suggests that Plaintiff sought to flee the scene or escape Defendant Officers, so the third factor only assesses the level of resistance of the Plaintiff.

[2] Even more troubling is the Officers' repeated characterization of Plaintiff's noncompliance, or passive resistance, as threatening, endangering, and justifying the need for severe physical force and verbal assault.

of a police K-9" was "'clearly established' in 2013." *Harrold v. Hagen*, 174 F.4th 393, 401 (4th Cir. 2026). Of course, genuine issues of material fact exist, and a reasonable jury may find that Officers' actions were justified, necessary, and proportionate. Officers, however, may not benefit from qualified immunity at this time as the right was clearly established as early as 2013. And to the extent that Plaintiff challenges the excessive force used by Officers who physically assaulted him, the Fourth Circuit has "stated in forthright terms that 'officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.'" *Meyers v. Baltimore County, Md.*, 713 F.3d 723, 734 (4th Cir. 2013) (quoting *Bailey v. Kennedy*, 349 F.3d 731, 744–45 (4th Cir. 2003)).

### B. Intentional Infliction of Emotional Distress

For Plaintiff to succeed on a claim of intentional infliction of emotional distress, he must show:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3*, Travis v. Alcon Lab'ys, Inc.,* 202 W. Va. 369, 371, 504 S.E.2d 419, 421 (1998). Defendants assert that the conduct of Officers in this case was not "atrocious, intolerable, or so extreme and outrageous as to exceed the bounds of decency." [ECF No. 80, at 18]. But at summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Here, the record shows that Plaintiff, although passively resisting the shouted commands of Officers, was physically and violently removed from his vehicle. Officers deployed the K-9 who

remained latched on his leg for a duration of the encounter. Plaintiff was also struck while he was on the ground, overpowered by Officers, and not threatening. Plaintiff's injuries are similarly documented as resulting from this conduct. Believing Plaintiff's evidence and drawing the justifiable inferences in his favor, this "may be reasonably regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress." Syl. Pt. 4, *Travis*, 202 W. Va. at 371. Finding that Plaintiff has met his burden on his outrage claim, a reasonably jury must decide, among other things, "whether [Officers'] conduct is in fact outrageous." *Id.*

Defendant's statutory immunity and punitive damages argument also fails. West Virginia Code § 29-12A-5(b) provides immunity to employees of a political subdivision except in certain circumstances. But § 29-12A-18 makes clear that that Article 12 does not apply to "[c]ivil claims based upon alleged violations of the Constitution or statutes of the United States except that the provisions of section eleven of this article shall apply to such claims or related civil actions." W. Va. Code § 29-12A-18(e). And on punitive damages, while § 29-12A-7 prohibits an award of punitive or exemplary damages in a civil action involving a political subdivision or its employees, it "does not prohibit the recovery of punitive damages against a political subdivision employee sued in an individual capacity." Syl. Pt. 9, *Monongalia County Commission*, 251 W. Va. 442, 914 S.E.2d 677, 681 (2024); *see also Nelson v. Fisher*, No. 2:25-cv-00075, 2026 WL 852130, at *5 (S.D. W. Va. Mar. 27, 2026) (Berger, J.). Here, the Officers are sued in their individual capacities.

Additionally, based on the facts already described and drawing inferences in favor of the Plaintiff, a reasonable jury could conclude that Defendants acted with "actual malice toward the plaintiff or a conscious, reckless and outrageous indifference to the health, safety and welfare of others," thereby permitting recovery of punitive damages under W. Va. Code § 55-7-29.

Defendants may believe that their conduct was without malice or outrageous indifference to Plaintiff's safety, but that is for a jury to decide after it views and weighs all of the evidence.

Defendants also ask the court to limit Plaintiff's recovery to the evidence produced during discovery based on W. Va. Code § 29-12A-7(b). The court declines to limit Plaintiff's recovery at this stage, as that is a matter for trial, and the state code only provides that "noneconomic loss shall not exceed $500,000 in favor of any one person." W. Va. Code § 29-12A-7(b).

### C. *Monell* Claim Against Defendant City of Dunbar

Plaintiff also claims *Monell* liability against Defendant City of Dunbar under two theories: failure to train and persistent practice. *Monell* allows an individual to bring a § 1983 claim against a local government when its formal policies or customs result in a deprivation of rights under the Constitution. *See Braley v. Thompson*, 2:22-cv-534, 2023 WL 2351881, at *5 (S.D. W. Va. Mar. 3, 2023) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978)). Municipalities are "persons" within the meaning of § 1983 and thus can be sued when they inflict a constitutional injury. *Wickline v. Cumberledge*, No. 2:23-CV-00799, 2024 WL 3416282 (S.D. W. Va. July 15, 2024) (citing *Franklin v. City of Charlotte*, 64 F.4th 519, 530(4th Cir. 2023)). Municipalities inflict constitutional injuries where their "official policy or custom" causes the deprivation. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). This can occur in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Id.* A plaintiff must prove both that such policy or custom existed and that it caused or inflicted the alleged injury. *See Franklin*, 64 F.4th at 536; *see also Wellington v. Daniels*, 717 F.2d 932,

936 (4th Cir. 1983) (stating that a local government can only be liable "when there is a deprivation of constitutional right *caused* by" the policy) (emphasis in original). However, "isolated incidents of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice." *Lytle*, 326 F.3d at 473.

And for failure to train, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389. A plaintiff must "identify particular deficiencies in a training program that led to the plaintiff's injuries." *Barnes v. Montgomery Cnty.*, 2023 WL 8454633, at *3 (D. Md. Dec. 6, 2023). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 389.

Defendant City fails to view the record taking Plaintiff's evidence as true and drawing inferences in his favor. He identifies a deficiency in training—failure to train on de-escalation techniques—and the record shows that officers in this case, and other officers employed by the City, did not receive that training. [ECF No. 87, at 9–12]. This is not a "scattershot" or "generalized" allegation that training is *somehow* inadequate, as the Defendants assert. *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). Rather, Plaintiff has shown evidence of a "specific deficiency," the lack of de-escalation training, and a "specific violation," excessive force in conducting an arrest of detention of suspected lawbreakers. *Spell*, 824 F.2d 1380, 1390 (4th Cir. 1987) (evidence of "general laxness or ineffectiveness in training" is insufficient).

But Plaintiff is permitted to use as evidence other examples of excessive force or failure to deescalate situations based on the failure to train de-escalation. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997)). Plaintiff does just that, and a reasonable jury may conclude that the City of Dunbar failed to train Officers, based on the evidence in the record, and hold the city liable under *Monell*.

Relatedly, Defendant City asserts that the Plaintiff cannot rely on previous excessive force lawsuits to create a genuine issue of material fact of the City's persistent practice because those lawsuits ended in settlements. To be liable under the "persistent practice" method, "(1) the municipality must have actual or constructive knowledge of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers as a matter of specific intent or deliberate indifference to correct or terminate the improper custom and usage." *Howard v. City of Durham*, 68 F.4th 934, 953 (4th Cir. 2023) (internal quotations omitted). In other words, "a pattern of comparable practices" must be known to the policymakers. *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987). "Sporadic and isolated" incidents do not suffice under *Monell*; only "widespread or flagrant violations will." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 403 (4th Cir. 2014) (internal quotations omitted) (citing *Spell*, 824 F.2d at 1387).

While it is true that prior lawsuits—alone—cannot support a claim of persistent practice under *Monell*, they are certainly relevant. In *Spell v. McDaniel*, the Fourth Circuit specifically approved of admitting evidence of the defendant city's settlement of a previous police brutality action as it was "an essential element of [the plaintiff's] 'condoned custom' theory of liability, that the [defendant city] was sufficiently aware of the existence of a developed practice or custom of

11

such conduct," and its relevance outweighed any potential prejudice. 824 F.2d at 1400. Additionally, the record shows that Plaintiff also relies on investigative reports of prior excessive force incidents submitted to city officials as well as city meeting minutes.[3] Together, a reasonable jury could conclude that Defendant City had knowledge of and maintained a persistent practice of excessive force by its officers.

## IV.    CONCLUSION

The record in this case is full of genuine disputes material to Plaintiff's claims. A reasonable jury, acting as factfinder, must consider and weigh the evidence to resolve those disputes. Therefore, the Defendants' Motions for Summary Judgment, [ECF Nos. 77, 79], are **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:        June 4, 2026

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

---

[3] This also clearly demonstrates that city officials (the mayor and chief of police) were on notice of Dunbar officer conduct.

12